**STATE of Missouri, Respondent,**

v.

**Cleotis ROSS, Appellant.**

No. 57351.

Supreme Court of Missouri,
Division No. 1.

Dec. 10, 1973.

John C. Danforth, Atty. Gen., Vincent F. Igoe, Jr., Asst. Atty. Gen., Jefferson City, for respondent.

James R. Wyrsch, Koenigsdorf, Kaplan, Kraft, Fox & Kusnetzky, Kansas City, for appellant; Robert Jaquith, Warrensburg, of counsel.

HIGGINS, Commissioner.

Cleotis Ross, jointly charged with Willie Baker and Alfred Glasco with robbery, first degree, by means of a dangerous and deadly weapon, was, upon severance, convicted by a jury of robbery, first degree, as charged in the information as amended at the close of the evidence. The jury as-sessed defendant's punishment at five years' imprisonment; sentence and judgment were rendered accordingly. §§ 560.-120, 560.135, RSMo 1969 V.A.M.S. Rule 24.02, V.A.M.R. (Appeal taken prior to January 1, 1972.)

Appellant contends (III) that the court erred in refusing to direct a verdict of acquittal. His argument is that the evidence shows "only that witness Charles W. Riley believed defendant was present at Riley's T.V. when it was robbed and that a ring taken in the robbery was later found in close proximity to defendant after he was observed 'tugging' at his finger." He argues also that there was no proof of criminal agency of defendant by way of an exertion of force and a taking, and that the evidence fails to show any more than defendant's presence at the scene of the crime.

Mary Frances Riley, wife of Charles W. Riley, Sr., was a secretary at Riley's House of Television, 6009 Swope Parkway, Kansas City, Jackson County, Missouri. On November 16, 1970, at about 6:15 p.m., she was seated at her desk behind a counter when two young, well-dressed colored men opened the front door, walked toward her, came around the counter and asked "where the man was." Both men had guns in their hands. About that time Mr. Riley stepped in from another room and "the one in the white coat put his hand up against my head and the gun up against the other side." She was told not to move or make a sound. Mr. Riley "looked at me first, and the other man standing by the file cabinet; he reached for his gun and the man told him, 'Don't do that or I'll kill you' [Mr. Riley] * * *. Then the man that had the gun to my head said 'I'll kill you if you touch it; and I'll kill you, too.'" At this time the men disarmed Mr. Riley and shortly after this, James Lafferty walked in and sensed something was wrong. Mr. Lafferty was also placed under gun point and he and Mr. and Mrs. Riley were "shoved into the shop area"; and while "talking very rudely and using very foul

language," they "shoved us to the floor and told us to lay [face] down and tied our hands behind us." Mrs. Riley could hear other men in the room but saw only the two who confronted her. "They threatened us that if we turned around and looked, they would kill us." Her husband was removed from time to time during the robbery. Mrs. Riley made an inventory of items taken which included television sets, money from the safe, Mr. Riley's, gun, and one of the technician's watch and ring, all of a value of "close to five thousand dollars." Mrs. Riley was not able to identify defendant as one of the two men whom she observed.

Charles W. Riley, Sr., was a stockholder, vice president, and manager of Riley's House of Television, a corporation. (His son, Michael Riley, was president of the company.) On November 16, 1970, at about 6:15 p. m. two men came in with guns. One had a gun at his wife's head and, as he entered the office area, one stood there with a gun on him. He started to draw his gun and was told by the man holding a gun on his wife that he would kill her if he continued. He was disarmed and, at that time, the repairman, James Lafferty, came into the office. They put him under gun point also and the three "were herded into the television repair shop * * * [and] were told to lay on the floor with our faces down and * * * were tied up with electrical cords taken from the T.V. shop." Later, Mr. Riley was untied and told to lock the front door. He was taken at gun point to the front door which he locked and then to the back door where he showed them how it operated and locked. He was returned to the repair room, bound again, and later untied in order to unlock the safe under threat that he would be killed if he did not unlock the safe.

During his trip to the front door he discovered the presence of two other participants. While at the back door he noted that "they had driven one of our trucks to the loading dock, which is in the back of the appliance shop, or which is directly behind the office. They had pulled the truck up to this point; but they couldn't unlock the back door. So they forced me to unlock the back door of the truck."

Mr. Riley identified defendant as one of the second two assailants whom he saw on his forced trips to the front door, safe, and back door. He first saw defendant when he was taken to the front door. "He came up to ask the man that was taking me to the door, he asked him a question." He saw defendant's face at that time, and he was ordered not to look at the men's faces. He next saw defendant in the safe room. "I passed him; he was in this room; they took me directly past him." The safe room was small and well-lighted and Mr. Riley again saw defendant's face. He next saw defendant "on the loading dock at the rear of the building. When I was forced to open the truck he was standing directly there. It was my feeling that he was the driver—was going to be the driver of the truck." The dock was also well-lighted and Mr. Riley was able to observe defendant's face.

Mr. Riley estimated that the four men took two black and white television sets, several color television sets, and $1207 in money, a total value of not less than $4,500. All such property, including his wallet, was removed by use of the Ford van belonging to the company.

Most of Mr. Riley's cross-examination was devoted to testing his opportunity to observe and identify defendant and to the description he gave of defendant to the police. It appeared that Mr. Riley had described defendant as being six feet, one inch tall; he appeared by standing at trial to be closer to six feet, six inches in height. Cross-examination also showed that Mr. Riley did not recall defendant being armed.

Dilton Joe Nichols was employed at Riley's House of Television as a television technician. On November 16, 1970, he returned to the store from a service call. "I

walked through the door, why they stuck a gun in back of my head and said, 'Lay down'; and I laid down. * * * they pulled my ring and watch off." He did not have an opportunity to see the faces of any of his assailants. He identified Exhibits 2 and 3 in evidence as his Timex watch and diamond ring taken from him by the robbers. The watch, valued at $15, was the only one of its kind he had seen. The ring was gold, contained five diamonds, and had been "cut down so to fit my little finger."

Detective Tom Sooter of the Kansas City Police Department arrested defendant November 20, 1970. He was driving a car with two passengers, one in the right front seat and one in the rear seat. Officer Sooter stopped the car at 31st and Highland; it had been headed in a westerly direction. Defendant got out of the car on the driver's side; the passengers (Alfred Glasco and Willie Baker) got out of the right-hand door. Defendant "got out of the car and I ordered him to place his hands upon the car; and he began to move around the car. At that time then, the third occupant broke and ran; ran eastbound on 31st Street." After defendant got out of the car, "I observed him pulling at what appeared to be his little finger, as I can remember, probably the left hand; he was tugging at an object or something at—on his little finger." Officer Sooter approached defendant, ordered him to put his hands on the car, and found a gold-colored ring, Exhibit 3, "lying a few inches from his feet, between him and the car."

Officer Sooter also identified Exhibit 2 as a "wristwatch that I found on the Number Two suspect, Willie Baker, who was the one that fled from the car and was captured shortly thereafter."

Cross-examination of Officer Sooter revealed that defendant was unarmed when arrested. It also showed that the officer, in his observations of Willie Baker, did not see him make any tugging motions at his fingers.

The defense was by way of exoneration and alibi.

Willie Baker, jointly charged with defendant, was confined to the Intermediate Security facility of the Department of Corrections, Moberly, Missouri, serving a term of ten years assessed upon his plea of guilty to the November 16, 1970, robbery of Riley's House of Television. According to him, the robbery was committed by himself, William Bacon, Joseph Cowley, and one of William Bacon's friends. He identified Exhibit 2 as a watch he got from the robbery and which he was wearing when arrested on November 20, 1970. He identified Exhibit 3 as a ring he got from the robbery and which was in his possession prior to his arrest. "When the police stopped us, I threw it under the car and I ran."

Cross-examination revealed that Willie Baker also had a prior conviction for stealing from the person. He admitted lying with respect to failure to reveal the name of Joseph Cowley when he pleaded guilty to his own charge arising from the robbery.

Detective Robert Dodds of the Kansas City Police Department investigated the robbery at Riley's House of Television, arriving there at approximately 6:40 p. m. He interviewed Mr. and Mrs. Riley and two of their employees, and, with his partner, Detective Bobby Thurman, compiled a composit description of the suspects. There was no mention of a man six feet, six inches tall.

Willis Martin, defendant's uncle, was with defendant "most of that day [November 16, 1970], from about noon until—well, we was together, the best I can—we was together around noon for the rest of the night. * * * between 3:00 and 3:15, we drove down to the school * * * to pick up my son. * * * we returned back to the house [5344 Wabash], stayed there and had dinner, and homework for my son and watched a program on T.V.; and then I took my son over to his moth-

er's, the two of us together. And after that, we left there, and came down here to 14th and Oak and picked up one of the passengers [Patricia Brown] who got off from work down there."

Patricia Brown was a long-distance operator for Southwestern Bell Telephone Company, 14th and Oak, on November 16, 1970. On that date she saw defendant with his uncle, Willis Martin. " * * * him and his uncle, both, picked me up at work at 8:00; and I just got in the car; and then we went and they bought some beer and we went over to his uncle's house."

Defendant's case closed with the report of Patrolman Gary M. Smith, which described three suspects in the robbery as Negro males, age 20 to 21, height 6 feet, 1 inch.

From the foregoing, the jury reasonably could find that defendant was not only present at and during the robbery of Riley's House of Television, but also that his presence was in complicity with other men, two of whom were armed, and that he moved from room to room with them as Mr. Riley was forced to lock the front door, open the safe, and demonstrate the operation of the back door. It also connects defendant to the robbery by showing his possession of the ring taken from Mr. Nichols during the robbery. In total, the statement demonstrates a submissible case of robbery, first degree, of Charles Riley, by causing him to fear immediate injury to his person, as charged in the information as amended, and as submitted by Instruction Three. § 560.120, supra.

Citing the well-known cases dealing with lineups, "the Wade trilogy" and their progeny, appellant charges (I) that the court erred in refusing to suppress identification of defendant by Charles Riley because (A) defendant was subjected to impermissibly suggestive pretrial identification procedures, and (B) even if such procedures were not impermissibly suggestive, the pre-

trial identification was a product of illegal arrest and any in-court identification of defendant would be tainted, prejudicial, and therefore inadmissible.

Appellant's argument under (A) is that "because the witness did not have a source independent of the suggestive line-up upon which to base his identification of the defendant, it was error for the trial judge to refuse to suppress the In-court identification of defendant by Charles Riley." His argument under (B) is "that at the time of the original detention, the police had no intention of charging the defendant with the crime of robbery. * * * the actual arrest of defendant *for this robbery* occurred only after a credit card belonging to Riley Enterprises, Inc., was found in defendant's possession during an illegal search of his billfold at the Detention Center. * * * Without antecedent probable cause for the arrest, the defendant was required to participate in a line-up during which time he was identified by only one of the four victims of the robbery. * * * Therefore, the pre-trial identification was totally tainted by virtue of being the 'fruit' of the unlawful arrest. It follows that the in-court identification based upon the previous tainted pre-trial identification was prejudicial and inadmissible as evidence."

The insuperable difficulty with this contention is that, contrary to appellant's assertion, witness Charles Riley did have an independent source upon which to base his in-court identification of defendant; and, as a consequence, it is not necessary to examine the details of the alleged defects in pretrial identification procedures employed in this case.

United States v. Wade, 388 U.S. 218, 1. c. 240–241, 87 S.Ct. 1926, 1939, 1940, 18 L. Ed.2d 1149 (1967), established that when a defect appears in the pretrial lineup procedures, the government should have an "opportunity to establish by clear and convincing evidence that the in-court identifications were based upon observations of the suspect other than the lineup identifica-

tion"; and that in resolving the issue consideration should be given to " * * * prior opportunity to observe the alleged criminal act, the existence of any discrepancy between any prelineup description and the defendant's actual description, any identification prior to lineup of another person, the identification by picture of the defendant prior to the lineup, failure to identify the defendant on a prior occasion, and the lapse of time between the alleged act and the lineup identification. It is also relevant to consider those facts which, despite the absence of counsel, are disclosed concerning the conduct of the lineup."

In this case there was no attempt to bolster Mr. Riley's in-court identification of defendant by use of the lineup; the lineup and its incidents were not mentioned. The evidence shows that Mr. Riley observed defendant on at least three occasions during the course of the robbery: First, on the way under armed escort to lock the front door; second, in the confines of the safe room; and, third, on the loading dock while demonstrating the operation of the back door and unlocking the van door. Defendant cross-examined extensively to test these opportunities for observation and identification and utilized cross-examination of Mr. Riley and testimony of other witnesses to emphasize discrepancies in descriptions given of defendant.

■ When the evidence is considered with the criteria of United States v. Wade, supra, it shows that the in-court identification of defendant by Charles Riley had a source independent of pretrial lineup procedures, and the admission of Mr. Riley's testimony that defendant was one of his robbers was not error. State v. Williams, 448 S.W.2d 865, 868 (Mo.1970); State v. DeLuca, 448 S.W.2d 869, 873 (Mo.1970); State v. Mentor, 433 S.W.2d 816, 818 (Mo.1968); 9 Mo.Dig. Criminal Law ⊜339.

Appellant charges (II) that the court erred in failing to grant him a new trial "for the reason that had the State dismissed the case against Alfred Glasco prior to trial [defendant's], the defendant could have argued that there had also been a misidentification of defendant Ross."

It appears from the record that the charge against codefendant Alfred Glasco was dismissed following the verdict against Cleotis Ross for the reason that the prosecuting attorney did not feel that Mr. Glasco was one of the people who robbed Riley's. Appellant argues that even though the prosecuting attorney gave his complete file to defense counsel prior to trial, he "could have very well argued that two of the victims identified Alfred Glasco and only one identified Cleotis Ross and yet, the State then dismissed as to Glasco. Counsel for defendant could have made this argument, had he been apprised of the plan to dismiss prior to trial or during trial, instead of immediately after trial." By citation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), appellant asserts such was a suppression or withholding of evidence on demand of an accused, which, if made available would tend to exculpate him or reduce the penalty.

■ The cases cited by appellant in support of his argument hold only that a prosecuting attorney must disclose evidence known to him to be favorable to defendant. State v. Martin, 465 S.W.2d 594 (Mo. 1971). This matter does not fall within the purview of those cases. Insofar as this record shows, the prosecuting attorney simply exercised the discretion of his office to dismiss a case against one charged with the same offense as that laid against defendant. Appellant concedes that nothing was withheld from defendant by the State, and there is nothing to show that the dismissal was calculated to occur at a time or in a manner prejudicial to defendant's case. The dismissal appears as a matter purely collateral to the trial of defendant, and appellant's theory that the dismissal resulted from lack of identifica-

tion is based upon speculation and assumption.

Appellant contends (IV) that the amended information does not state an offense against defendant; that the proof was at variance with said information, and that Instruction Three did not state (submit) an offense and was contrary to law.

The original information charged that Willie Baker, Cleotis Ross and Alfred Glasco, on November 16, 1970, at Jackson County, Missouri, did unlawfully and feloniously make an assault upon Charles Riley with a dangerous and deadly weapon and did feloniously rob, steal, take and carry away $501 in currency, three described hand guns, one diamond ring, one Timex watch, and seventeen television sets of an aggregate value of $3348, property of Riley Enterprises, Inc., in the care and custody of Charles Riley, from the person against the will of Charles Riley by putting him in fear of immediate injury.

According to appellant, the amendment at the conclusion of the evidence at trial, charged the three codefendants with robbery as aforesaid of Riley Enterprises, Inc., and Dilton Nichols, the televisions and currency being taken from the custody of Charles Riley and the watch and ring from the person of Dilton Nichols.

Instruction Number Three submitted:

"If you find and believe from the evidence beyond a reasonable doubt:

"First, that on the 16th day of November, 1970, in the County of Jackson, State of Missouri, Charles Riley was in charge of Five Hundred One Dollars ($501.00) in lawful currency of the United States, and seventeen (17) televisions; and

"Second, that at the time and place the defendant took the property from Charles Riley against his will by causing him to fear immediate injury to his person; and

"Third, that the defendant took the property with the intent to permanently deprive Charles Riley of his right to it and

to convert it or any part of it to his own use; then you will find the defendant guilty of robbery in the first degree.

"However, if you do not find and believe from the evidence beyond a reasonable doubt each and all of the foregoing, you must find the defendant not guilty of that offense.

"If you do find the defendant guilty of robbery in the first degree, you will fix his punishment at imprisonment by the Department of Corrections for a term fixed by you, but not less than five years."

Appellant argues that Instruction Three and the information as amended fail to require the jury "to find the defendant was acting 'alone or in concert' as would the conventional instruction when multiple parties are allegedly involved in a crime. * * * Thus, neither the Amended Information nor the Instruction states a crime against this defendant." He argues also that the proof is at variance with both the instruction and the amended information because "the evidence no where disclosed that Defendant Ross was at any time armed during the course of the robbery. There is no evidence that he, himself, 'took the property from Charles Riley.'"

■ It has already been demonstrated, Point III, that the State made a submissible case of robbery, first degree, against defendant under the information as amended and as submitted by Instruction Three. It is not necessary to show that defendant, himself, committed all the acts constituting the elements of the offense. State v. McKissic, 358 S.W.2d 1 (Mo.1962). When two or more persons participate in a robbery and one is accessory or constructively or actually present for the purpose of aiding in the commission of the robbery, all may be charged and convicted of the principal offense. State v. Stinson, 379 S.W. 2d 545, 547 (Mo.1964). Defendant was identified as one of at least three robbers, and he is liable for what the others did as

well as for his own actions. State v. Thompson, 299 S.W.2d 468, 474 (Mo.1957).

It is true that a conventional instruction in this situation would probably employ language leading to a finding that defendant acted "alone or in concert," State v. Booker, 454 S.W.2d 927 (Mo.1970); however, he has not demonstrated how he was prejudiced by omission of such language from the instructions in this case.

■ Appellant charges (V) that "error was created when a juror was permitted to stand and ask a question directed to Officer Sooter's testimony concerning fingerprints."

It appears that defendant concluded his cross-examination of Officer Sooter by asking if he dusted the ring, Exhibit 3, for fingerprints. Officer Sooter stated he did not, and the State, by redirect examination, elicited that he did not do so "because of the texture of the metal, the shape, the size, it would not yield any fruits." By re-cross-examination, defendant elicited that by "yield fruits," the officer meant that so many points or "lines" of a print are necessary before it can be identified "to a specific print or can even be identified as a print." At the conclusion of defendant's cross-examination, the court announced a recess; however, juror Tungett raised his hand and stated he "did not understand the lines part * * *." The court then returned Officer Sooter to the stand for further questions and both the prosecution and defense participated. The witness explained the meaning of lines in fingerprint lifting and reading.

Critical to resolution of this contention is that all of this occurred without objection. Accordingly, the asserted error was not preserved for review. Rule 27.20(c), V.A.M.R.

■ Appellant contends (VI) that the court erred in admitting the ring and watch taken from Dilton Nichols. He argues that those items were not admissible because they were evidence of another crime under State v. Reese, 364 Mo. 1221, 274 S.W.2d 304 (banc 1954). See also State v. Carter, 475 S.W.2d 85 (Mo.1972); State v. Reed, 447 S.W.2d 533 (Mo.1969).

State v. Reese, supra, also recognizes certain exceptions to its rule, and evidence of other crimes is competent to prove the specific crime charged when it tends to establish " ' * * * (3) the absence of mistake or accident; (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the other; (5) the identity of the person charged with the commission of the crime on trial.' " 274 S.W.2d l.c. 307.

Defendant's possession of the ring taken from Mr. Nichols during the robbery at Riley's House of Television tended to show he was one of the robbers, and possession by defendant's associate, Willie Baker, of the watch, also taken from Mr. Nichols during the robbery, tended also to identify defendant with the robbery. Accordingly, admission of these items falls within the noted exceptions to the rule of State v. Reese, supra.

Appellant asserts in a kindred point (VII) that the State was permitted to make unfair and prejudicial remarks in closing argument in which the prosecuting attorney linked defendant to the ring and watch by argument and display of the ring to the jury.

■ Since the items were properly in evidence, it was also proper for the State to comment on them in closing argument.

■ Appellant asserts (VIII) that the verdict was a "compromise verdict." He neither asserts nor demonstrates what prejudice occurred to him on this score; and his only argument is that since the jury assessed the minimum penalty, "This evidences that the jury reached a compromise

verdict, and the law does not approve or contemplate compromise verdicts."

Appellant has not supported this assertion with authority. Neither does it prove itself. The verdict is lawful in that the punishment assessed is within the limits prescribed by statute, and it may not be said to be in some way improper on this record.

By Point IX appellant asserts that the watch and ring were incompetent and immaterial evidence, this time for the reason that the watch was not found on defendant and the ring was never "adequately proven" to have been in possession of defendant. This matter has been adequately considered under Point VI and it remains without merit.

█ Appellant charges (X) the court erred in permitting counsel for the State to ask a question (of the venire) concerning prejudical pretrial publicity. He asserts further that the State inquired of the panel as to prior knowledge of the robbery, and to "shore up" his position that he was entitled to so inquire, the State's attorney offered Exhibit 1, a news item from the Kansas City Star concerning the robbery. Appellant argues that the combination was an attempt to arouse a memory of the robbery and to unduly emphasize the case.

Appellant has not filed any of the voir dire with his appellate transcript; and the transcript reference to Exhibit 1 shows that it was never read nor passed to the jury. Such circumstances are not adequate to present the point for review.

Judgment affirmed.

WELBORN, C., concurs.

PER CURIAM:

The foregoing opinion by HIGGINS, C., is adopted as the opinion of the Court.

All of the Judges concur.